TRADERS COMPRESS CO. v. UNITED STATES.

NORTHWESTERN COMPRESS CO. v. SAME.

LUBBOCK COMPRESS CO. v. SAME.

COTTON CONCENTRATION CO., Inc., v. SAME.

FEDERAL COMPRESS & WAREHOUSE CO. v. SAME.

Nos. 45767, 45801, 45802, 45825, 46270.

Court of Claims.

Dec. 1, 1947.

Frank C. Brooks, of Dallas, Tex. (Callaway & Reed, of Dallas, Tex., on the briefs), for plaintiffs.

D. B. MacGuineas, of Washington D. C., and Peyton Ford, Asst. Atty. Gen., (Horace G. Marshall, of Chicago, Ill., on the brief), for defendant.

Before JONES, Chief Justice, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

JONES, Chief Justice.

Plaintiffs are cotton compress and warehouse companies, and during the period involved were engaged in selling their services in connection with cotton to the public for compensation. Among the services rendered to the owners of cotton were the compressing and storing of the bales of cotton, unloading them from and loading them into box cars and in some instances delivering the cotton to trucks and to shipside on behalf of the owners.

Plaintiffs published and maintained schedules of charges made by them for services rendered.

The issue to be decided in these consolidated cases is the amount of charges to be paid plaintiffs for services rendered by them in storing and handling cotton owned by the Federal Surplus Commodities Corporation (F. S. C. C.) and the Surplus Marketing Administration (S. M. A.).

Plaintiffs, after negotiations, made contracts with the Commodity Credit Corporation (C. C. C.), by the terms of which rates lower than the customary charges were made for cotton owned by the C. C. C. or on which it had loans.

The question is, Do the provisions of the C. C. C. contracts for reduced rates inure to the benefit of cotton owned or handled by the F. S. C. C. or the S. M. A.?

On October 4, 1933, the Federal Surplus Relief Corporation was organized under the laws of the State of Delaware, pursuant to the authority of the National Industrial Recovery Act, 48 Stat. 195. Its name was changed to Federal Surplus Commodities Corporation on November 16, 1935, by amended certificate of incorporation. The objects of the corporation are set out in finding 7. Its major purpose was the purchasing, storing, handling, and processing of surplus agricultural and other commodities and the products thereof, and the disposing of them in such a way as to relieve hardship and suffering caused by unemployment, and to adjust the disparity in prices between agricultural and other prices. It had other broad powers. It had no capital stock. Its members were the Secretary, Under Secretary, and Assistant Sec-

retary of Agriculture. Its business was to be managed by a Board of Directors.

The Commodity Credit Corporation was organized October 17, 1933, under the laws of the State of Delaware, under Executive Order Oct. 16, 1933, No. 6340 (finding 8), pursuant to the National Industrial Recovery Act. The Secretary of Agriculture and the Governor of the Farm Credit Administration were authorized and directed to form the corporation. Its objects are set out in finding 9. Its primary activities were to purchase, deal in and sell agricultural or other commodities and to loan money on such commodities. There were other broad purposes. The two officials named were authorized to subscribe for all the capital stock with money available under an appropriation act.

During the years 1934 and 1937 there was an overproduction of cotton and large quantities were stored in plaintiffs' warehouses.

The Commodity Credit Corporation became the owner of certain of this cotton in two ways:

(1) It acquired title to some of it before it was placed in storage, and upon being placed in storage warehouse receipts were issued to the corporation.

(2) Other portions of the cotton were placed in storage with plaintiffs by private owners to whom plaintiffs delivered negotiable warehouse receipts therefor. Thereafter Commodity Credit Corporation loaned money to the private owners and the warehouse receipts were delivered to the Commodity Credit Corporation as security. Subsequently, and prior to the transactions involved here, the Commodity Credit Corporation foreclosed these liens, thus acquiring title to and becoming the owner of the cotton represented by such receipts.

Such cotton will be referred to as Commodity cotton.

The Federal Surplus Commodities Corporation acquired cotton in connection with its activities which were independent of and had no connection with those of the Commodity Credit Corporation. It was acquired by purchase from individual owners who held negotiable warehouse receipts.

The cotton thus acquired will for convenience be referred to as Shipper cotton.

Some of this Shipper cotton was later exchanged for Commodity cotton, but otherwise had no relation in any way to the cotton owned by the Commodity Credit Corporation.

On July 1, 1939, the President's Reorganization Plan No. 1, Section 401(a), 5 U.S. C.A. following section 133t, directed that the Farm Credit Administration, the Federal Farm Mortgage Corporation, and the Commodity Credit Corporation, be transferred to the Department of Agriculture and placed under the general direction and supervision of the Secretary of Agriculture, and on August 7, 1939, Executive Order No. 8219 specifically designated the Secretary of Agriculture as officer to exercise on behalf of the United States any and all rights of the United States arising out of the capital stock of the Commodity Credit Corporation.

In 1939 the Commodity Credit Corporation informed plaintiffs that it wanted the rates reduced on cotton owned or controlled by it and stored with plaintiffs. It urged several reasons for such reduction, including the compact manner of storage of Commodity cotton, the larger volume, the smaller expense in handling and the inactivity in the movement of such cotton. After negotiations, the plaintiffs were willing to reduce the rates to be charged the Commodity Credit Corporation because they anticipated among other advantages that a large volume of cotton would remain in inactive storage for a long period of time and would be cheaper to handle than would cotton owned by individual owners and which was usually disposed of during the season in which it was produced.

Another consideration was the fact that normally every bale of cotton when delivered to the plaintiffs for storage was tagged with an indentification number and a record made of the location in which it was stored. Thus cotton that was stored and expected to be withdrawn in the season in which it was produced was placed four rows deep with an aisle between each four rows in order to facilitate handling when ordered out by tag number. In this way

the specific bale could be taken from the outside row without first moving any other bale, and from the inside row by simply moving one other bale.

The cotton owned by Commodity Credit Corporation was much more compactly stored in order to make greater use of storage facilities. This method made it necessary to move a number of bales in order to reach any specific bale. The method of storing and handling was established by the plaintiffs, however, and not at the instance of the Government. All of the Commodity cotton had been in storage with the respective plaintiffs since either 1934 or 1937 and prior to October 1939 had been consolidated and in some instances transferred to other warehouses in order to make room for cotton produced in the current season of 1939.

Plaintiffs would not have entered into the agreement for reduced rates had they anticipated that Commodity cotton would be handled in smaller quantities or in other than the usual way in which it had theretofore been handled.

In October 1939 the plaintiffs by contract with the Commodity Credit Corporation agreed to reduce the rates for storing and servicing cotton owned by Commodity Credit Corporation or pledged to it as security for a loan. The contract for reduced rates contained the following further provision:

"2. The provisions of this contract shall accrue to the benefit of the holders of the warehouse receipts representing cotton released from the loan or sold by the Corporation for a period extending from the effective date hereof to 15 days from the date of release of such warehouse receipts by the Corporation, provided the Corporation marks such warehouse receipts to show the date of such release."

At the time these contracts were executed the Commodity Credit Corporation had not disposed of any Commodity cotton through commercial channels. Plaintiffs expected that such cotton would eventually be disposed of, but at the time of executing the contract did not know the manner in which this would be done.

In October 1935 the Federal Surplus Commodities Corporation entered upon a program under which cotton would be purchased and delivered to persons eligible to receive surplus commodities. An expenditure of several million dollars was authorized for this purpose, and the cotton was to be used partly for a mattress program for low-income groups and through other distribution channels.

The Federal Surplus Commodities Corporation wanted to secure cotton of certain characteristics owned by the Commodity Credit Corporation. An exchange was arranged between the two corporations whereby Federal Surplus Commodities Corporation which had purchased cotton in the open market surrendered such cotton to Commodity Credit corporation in exchange for Commodity cotton. The agreement provided for an adjustment in the ratios of cotton exchanged to compensate for differences in the values of the cotton as determined by grade and staple. The agreement between the two corporations was made on February 9, 1940, and was modified on May 8, 1940, because of the President's Reorganization Plan No. 3 which in effect abolished the Federal Surplus Commodities Corporation by consolidating its functions with those of the Division of Marketing and Marketing Agreements of the Agricultural Adjustment Administration, and creating a new agency in the Department of Agriculture known as Surplus Marketing Administration. All the funds of the Federal Surplus Commodities Corporation were transferred to the new agency.

After the services had been rendered by plaintiffs to Federal Surplus Commodities Corporation and Surplus Marketing Administration, they submitted their statements to these agencies for payment, basing their charges on their regular tariffs. These invoices, however, were not paid as rendered, but reduced to the basis of the Commodity Credit Corporation contract.

The plaintiffs assert that the reduced rates were made applicable to cotton owned or controlled by the Commodity Credit Corporation alone, and applied to no other cotton; that the reason for the reduced rates was longer prospective storage, the more compact and less expensive storage that was possible in the usual method of

handling Commodity cotton, and the larger quantities in which the Commodity Credit Corporation usually handled its transfers and dispositions; that none of these reasons applied to cotton handled by Federal Surplus Commodities Corporation or Surplus Marketing Administration; that most of the latter cotton was handled through relief or other distribution channels in small quantities and in special grades and staple lengths, entailing much greater expense in handling; that because of these facts, as well as the limitations in the contract itself, there was no reason for allowing the lower rates to either the Federal Surplus Commodities Corporation or the Surplus Marketing Administration.

The defendant contends that all these corporations were owned and controlled by the United States Government, and that the ownership of the cotton was in reality the ownership of the Government, and therefore the contract was in effect in each case with the United States Government; that therefore the reduced Commodity Credit Corporation rates should apply to all cotton handled by the Government itself.

The fact that the Commodity Credit Corporation, the Federal Surplus Commodities Corporation, and the Surplus Marketing Administration are, or were, agencies of the United States Government does not serve to override the specific provisions of a contract that is by its terms limited to one of them alone. The reduced rates were restricted to cotton owned or pledged as security for loans made by the Commodity Credit Corporation. The reasons for the reduced rates were well known to both parties. They were specifically limited to cotton controlled by the particular agency. The naming of the agency and limitations of the contract served to exclude other cotton. United States v. New York, Chicago & St. Louis Ry. Co., 6 Cir., 32 F.2d 887, 888, 889; Detroit, Toledo & Ironton Ry. Co. v. United States, 79 Ct.Cl. 227, 232.

Numerous executive orders were issued under the National Industrial Recovery Act and other acts, and a great many corporations were organized for the purpose of handling different phases of the many problems that arose. To hold that the fact that the Government owned or controlled all these corporations would cause a contract limited by its terms to one of them to apply in its terms to all of them in the farflung activities of government would not only cause widespread confusion, but would make it difficult for the Government to secure a contract on reasonable terms because of the implications that any contract with the Government would thus involve.

It is well recognized that Government-owned corporations have authority to enter into binding contracts and for the purpose of such contracts will be treated as separate entities. United States v. Strang, 254 U.S. 491, 493, 41 S.Ct. 165, 65 L.Ed. 368; United States Shipping Board Merchant Fleet Corporation v. Harwood, 281 U.S. 519, 525, 526, 50 S.Ct. 372, 74 L.Ed. 1011.

There were reasons for reducing the rates on Commodity cotton and excluding other cotton. Even if there had not been, the terms of the contract applied to Commodity cotton alone. The Government should be bound by the terms of its contract the same as anyone else. Heil v. United States, D.C., 273 F. 729, 731.

By the terms of the contract the new holders of any warehouse receipts were entitled to the CCC rates for a period of 15 days from the date of such receipts. The plaintiffs' claims should therefore be reduced in each instance by the difference between the contract rates and the published schedules for the 15-day period. And the small items claimed in findings 42, 43, and 44 cannot be allowed because one of them was not properly presented, and the others not satisfactorily proved.

The plaintiffs are entitled to recover from the defendant as follows:

Traders Compress Company, $10,486.64; Northwestern Compress Company, $3,463.09; Lubbock Compress Company, $2,378.85; Cotton Concentration Company, Incorporated, $2,874.23; and Federal Compress & Warehouse Company, $3,122.97.

It is so ordered.